UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ABRAMOU,

Petitioner,

v.

UNITED STATES DEPARTMENT OF JUSTICE AND HOMELAND SECURITY,

the Government.

26 Civ. 664 (DEH)

**OPINION AND ORDER**

DALE E. HO, United States District Judge:

On January 21, 2026, Petitioner Vladislav Abramou ("Petitioner" or "Mr. Abramou"), a lawful permanent resident subject to a final order of removal filed a pro se petition for writ of habeas corpus ("Pet." or "Petition"), ECF No. 1, seeking release from custody pending his removal from the country because he had been detained for longer than 90 days. On January 26, 2026, this Court issued a stay of removal and ordered the Government to show cause as to, inter alia, "whether there is any basis to distinguish this case from this Court's decisions in *J.M.P. v. Arteta*, No. 25 Civ. 4987, 2025 WL 2614688 (S.D.N.Y. Sept. 10, 2025) and *J.M.P. v. Arteta*, No. 25 Civ. 4987 2025 WL 2984913 (S.D.N.Y. Oct. 23, 2025), or from any other decision of this Court." ECF No. 6. On January 8, 2026, the Government filed a letter stating that "[t]he facts in this case are materially distinguishable from" the above-cited cases because "Petitioner is subject to a final order of removal, and is detained under 8 U.S.C. § 1231(a)(6) pending his removal." ECF No. 8. The Court then ordered the Government to file further briefing as to why the Petition should not be granted. ECF No. 10.

The Government filed its response brief on February 3, 2026, arguing that "there is no 90-day limit for detention pending removal" and that after the mandatory 90-day period of detention following a final order of removal, "further detention is authorized and is discretionary." Resp't's

Opp'n at 5, ECF No. 11. The Government further stated that "ICE expects to obtain travel documents and successfully remove Petitioner . . . in the reasonably foreseeable future." *Id.* On February 6, 2026, this Court received a letter from Petitioner which it construed as a reply to the Government's opposition briefing. Pet'r's. Reply, ECF No. 16. There, Petitioner detailed various transfers between detention facilities and stated that at some point during his period of detention he was "flown to JFK then Uzbekistan. When [he] arrived at Uzbekistan, [he] was not permitted in the country because [he] had no travel documentation. [He] was then taken back to the United States after being stuck in Uzbekistan for three days." *Id.* The Government had not mentioned this failed effort to remove Mr. Abramou to Uzbekistan in its opposition brief.

The briefing raised more questions than it answered. Requiring more information, the Court ordered the Government to file additional briefing to show cause as to why the Court should not issue the requested writ. ECF No. 17. That briefing was filed on March 13, 2026. Resp't's Suppl. Opp'n, ECF No. 18. On March 17, 2026, the Court requested the Clerk of Court to attempt to locate pro bono counsel to represent Petitioner in this case. ECF No. 20. On March 19, 2026, pro bono counsel filed a notice of appearance on behalf of Petitioner, ECF No. 21, and the Court ordered Petitioner to file a response to the Government's supplemental briefing. ECF No. 22. That supplemental reply briefing was filed on April 3, 2026, ECF No. 24, and a hearing on the matter was held on April 10, 2026 ("the Hearing").

At the Hearing, this Court issued an oral ruling **GRANTING** the Petition under the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678, 699 (2001), because Mr. Abramou's removal from the country was unlikely in the reasonably foreseeable future, and noted that this written Opinion would follow. ECF No. 25.

## BACKGROUND[1]

Mr. Abramou was born in the Uzbek Soviet Socialist Republic, a now non-extant country. Resp't's Suppl. Opp'n at 1. On November 22, 1996, Mr. Abramou was admitted into the United States as a refugee, and he became a lawful permanent resident on February 24, 1999. Resp't's Opp'n at 2.

In 2012, Mr. Abramou pleaded guilty to grand larceny in the fourth degree under New York Penal Law § 155.30(1), and he was sentenced to 364 days of imprisonment. *Id.* Five years later, in 2017, Mr. Abramou again pleaded guilty to attempted grand larceny in the third degree under New York Penal Law §§ 155.35(1). *Id.* He received a sentence of eighteen months to three years of imprisonment for this conviction. *Id.*

Following his second conviction, on June 12, 2018, Immigration and Customs Enforcement ("ICE") served Mr. Abramou with a Notice to Appear (the "2018 NTA"), charging him with removability under 8 U.S.C. §§ 1227(a)(2)(A)(ii) & (iii) as a noncitizen "convicted of two or more crimes involving moral turpitude, and of an aggravated felony." *Id.* at 2-3. Mr. Abramou moved to terminate his removal proceedings because his 2017 conviction lacked finality, and on April 19, 2019, an Immigration Judge granted Mr. Abramou's motion. *Id.* at 3. The Board of Immigration Appeals ("BIA") affirmed that decision on October 10, 2019. *Id.*

In 2023, Mr. Abramou pleaded guilty to robbery in the third degree under New York Penal Law § 160.05, and he was sentenced to two to four years of incarceration. *Id.* On January 17, 2024, ICE again initiated removal proceedings, serving Mr. Abramou with a NTA (the "2023 NTA") charging him with removability under the same authority cited in the 2018 NTA. *Id.* On

[1] The following facts are drawn from the parties' submissions in support of and in opposition to the Petition for Writ of Habeas Corpus, as well as the declarations and other exhibits attached to the briefing. Citations incorporate by reference the documents cited therein.

October 16, 2024, Mr. Abramou admitted to the factual allegations in the 2023 NTA, and on February 19, 2025, an Immigration Judge found that Mr. Abramou's 2017 conviction was an aggravated felony amounting to "particularly serious crime" such that his asylum and withholding of removal applications were precluded, and sustained the charges of removability and denied all relief, including his Convention Against Torture application. *Id.* As a result, Mr. Abramou was ordered removed to Uzbekistan. *Id.* Mr. Abramou did not take an appeal, and the removal order became final on March 21, 2025. *Id.*

On July 3, 2025, Mr. Abramou was taken into immigration custody, Pet. at 5; Decl. Jonathan Quizhpi ("Quizhpi Decl.") ¶ 16, ECF No. 13, pursuant to 8 U.S.C. § 1231(a), Resp't's Opp'n at 4. ICE then began its efforts to remove Mr. Abramou. On August 5, 2025, ICE submitted Mr. Abramou's Uzbek Soviet Socialist Republic birth certificate to the Consulate General of the Republic of Uzbekistan ("Uzbekistan"), seeking a travel document on Mr. Abramou's behalf. Resp't's Suppl. Opp'n at 1. ICE never obtained approval or denial of a travel document, but nevertheless "placed [Mr. Abramou] on an escorted repatriation flight" to Uzbekistan on November 4, 2025, *id.* at 1-2, based on the "belief that Uzbekistan would accept Petitioner for repatriation," which was "informed by prior successful removals of individuals . . . born in Uzbekistan *after* the dissolution of the Soviet Union," Decl. Mincheol So ("So Decl.") ¶¶ 3-4, ECF No. 18-1 (emphasis added). The Government subsequently acknowledged that Mr. Abramou's birth in the Uzbek Soviet Socialist Republic during the Soviet era was "a circumstance distinct from those prior cases," but averred that "[i]n the absence of an explicit refusal and based on prior experience, ICE officers determined there was a reasonable probability that Petitioner could be admitted upon arrival in Uzbekistan with his birth certificate and removal documentation." *Id.* at ¶¶ 5-6.

ICE's "reasonable belief" that Uzbekistan would admit someone who was born before the founding of present-day Uzbekistan and who did not have any valid travel documents issued by Uzbekistan proved to be wrong, as "Uzbek authorities declined to admit Petitioner" upon arrival. *Id.* at ¶ 8. Mr. Abramou was brought back to the United States on November 6, 2025, and ICE continued its efforts to remove Mr. Abramou from the country. *Id.* at ¶ 9-10. On December 2, 2026, the Consulate General of Uzbekistan informed ICE that "they were unable to locate a profile matching Petitioner's identity" based on the information included in Mr. Abramou's travel document request. Quizhpi Decl. at ¶ 23. It is remarkable that the Government, despite arguing in its initial opposition briefing dated February 3,206, that Mr. Abramou's removal from the country is "reasonably foreseeable," omitted these events.

In any event, after this failed attempt to remove Mr. Abramou to Uzbekistan, the Government then sought to initiate steps to remove Mr. Abramou to Uzbekistan a second time, but nothing has come of these efforts. On January 15, 2026, ICE submitted a renewed travel document request to the Consulate General of Uzbekistan, again including Mr. Abramou's Uzbek Soviet Socialist Republic birth certificate. *Id.* at ¶ 24. The Government represented in its March 15 supplemental briefing that, since then, ICE has continued to "locate[] additional documents related to Petitioner's parents' identity and marriage issued by the Uzbek Soviet Socialist Republic" and is "gathering further information regarding Petitioner's residency and civil engagement in Uzbekistan" in an effort to "submit another travel document request . . . along with a request for an interview of the Petitioner by the Consulate General of Uzbekistan." *Id.* at ¶ 25. But at the April 10 Hearing, however, the Government could not identify a single concrete step that it had actually taken since January 15 to obtain travel documents from Uzbekistan for Mr. Abramou, and acknowledged that there had been no movement on its request to schedule an interview with the Consulate General of Uzbekistan. April 10, 2026 Hearing Tr. ("Hearing Tr.") at 16:9-19. The

Government also represented that it was unaware of any data related to the rates at which Uzbekistan admits people who were born in the Uzbek Soviet Socialist Republic. *Id.* at 17:23-18:8.

Following ICE's unsuccessful attempts at removing Mr. Abramou to Uzbekistan, "ICE has endeavored to obtain travel documents from Israel on behalf of [Mr. Abramou] because his parents are Jewish and he can apply for Israeli citizenship according to . . . the Law of Return." So Decl. at ¶ 17; *see also* Quizhpi Decl. at ¶ 26. On February 10, 2026, ICE mailed a travel document request to the Israeli Consulate, and between February 18, 2026 and March 4, 2026, ICE attempted to contact the Israeli Consulate by phone, but was unable to speak with anyone. So Decl. at ¶¶ 12-13. On March 5, 2026, ICE sent an Officer to the Israeli Consulate to inquire in person; the Officer was informed that Mr. Abramou's travel document request had never been received, and ICE was subsequently provided with an email address through which it could re-submit Mr. Abramou's application. *Id.* at ¶ 14. ICE resubmitted the travel document request, purportedly on behalf of Mr. Abramou, to the Israeli Consulate via email on March 9, 2026, and on March 13, 2026, the request was rejected. *Id.* at ¶¶ 15-16. The Israeli Consulate explained "that they do not have a record of Petitioner's Israeli citizenship and that no travel document can be granted solely based on the fact that Petitioner's parents are Jewish." *Id.* at ¶ 16.

In its supplemental briefing submitted to the Court on March 13, 2026, the Government represented that "ICE will continue to work with Israeli authorities to first obtain citizenship for [Mr. Abramou] based on section 4A of the Law of Return of 1950, and then submit a new travel document request on that basis[,]" and estimated that "it will take from three to six months to apply for and obtain Israeli citizenship on [Mr. Abramou's] behalf." *Id.* at 17-18. At the Hearing, however, the Government acknowledged that applying for Israeli citizenship required Mr. Abramou's consent and cooperation, and that no progress had been made on obtaining Israeli

citizenship for him because Mr. Abramou had not actually applied for it. Hearing Tr. at 18:22-19:21. At the Hearing, Mr. Abramou stated that he was not interested in Israeli citizenship. *Id.* at 35:25-36:5.

At the time of the Hearing on April 10, 2026, Mr. Abramou had been detained in immigration custody for nine months and seven days.

## LEGAL STANDARD[2]

Noncitizens—whether here lawfully, unlawfully, temporarily, or permanently—are entitled to the Fifth Amendment's due process protections. *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020). "Noncitizens are also entitled to challenge through habeas corpus the legality of their ongoing detention." *Id.* "Habeas review is not limited to evaluating the lawfulness of detention when it is first imposed . . . but is also available to challenge whether, at some point, an ongoing detention has become unlawful." *Id.* "The Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Id.*

Under the authority governing Mr. Abramou's detention, upon the issuance of a final order of removal, a person "shall [be] remove[d] . . . from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). This 90-day period is referred to as the "removal period," *id.*, and during this time, the noncitizen must be detained. *Id.* § 1231(a)(2)(A). If someone is not removed within the 90-day removal period, they generally must be released from detention and placed under supervision while their removal remains pending. *Id.* § 1231(a)(3). However, when the basis of someone's removal is due to a criminal conviction pursuant to 8 U.S.C. § 1227(a)(2), release is

[2] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

not mandatory and continued detention beyond the 90-day removal period becomes discretionary. *Id.* § 1231(a)(6). Here, the 90-day removal period for Mr. Abramou expired in October, 2025. *See id.* § 1231(a)(1)(B)(iii). Therefore, Mr. Abramou's current detention is discretionary, not mandatory. *See id.* § 1231(a)(6).

While discretionary, the detention authority of the Attorney General under § 1231(a)(6) is limited by the Fifth Amendment's Due Process Clause, and detention is therefore only permitted for "a period reasonably necessary to secure removal." *Zadvydas*, 533 U.S. at 699. Under these circumstances, the Supreme Court has recognized a "presumptively reasonable period of detention" of six months. *Id.* at 701. That is, after six months of detention pending removal, "once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* And, "as the period of prior postremoval confinement grows, what counts as the 'reasonably foreseeable future' conversely . . . h[as] to shrink." *Id.* "Thus, if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Id.* at 699-700.

**DISCUSSION**

At the time of the Hearing on this matter, Mr. Abramou had been in immigration detention for more than nine months, well beyond the six-month period the Supreme Court has deemed presumptively reasonable for a person subject to a final order of removal, and the Court finds that Mr. Abramou has met his preliminary burden of showing there is "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future." *Id.* at 701. Mr. Abramou has a birth certificate from what the Government acknowledges is a nonextant country, the Uzbek Soviet Socialist Republic. On November 4, 2025, the Government attempted removal of Mr. Abramou to Uzbekistan, but the Uzbek authorities refused his entry, and he was returned

to the United States. Subsequent efforts to obtain travel documents to Uzbekistan and to Israel have been unsuccessful, with the latter requiring Mr. Abramou to affirmatively seek Israeli citizenship, in which he states he has no interest. Thus, at the time of the Hearing—more than five months after the Government's first effort to remove him to Uzbekistan—Mr. Abramou remained in the United States with no movement on his removal.

From the time that his detention began in July 2025 to the date of the Hearing in April 2026, the degree of to which Mr. Abramou's removal was in the "reasonably foreseeable future" shrank correspondingly, and the Government has not provided evidence sufficient to rebut Mr. Abramou's showing that there was no significant likelihood of removal. *Lu v. Genalo*, 817 F. Supp. 3d 176 (S.D.N.Y. 2025) is instructive. There, the court held that evidence showing "that [petitioner's] travel document request [was] not languishing but [was] still being processed, albeit more slowly than anticipated[,]" was sufficient to rebut the petitioner's initial showing that there was no significant likelihood in the reasonably foreseeable future. *Id.* at 184. Specifically, in *Lu*, Government provided evidence that petitioner had interviewed with the consulate, that the "embassy ha[d] not affirmatively indicated that they refuse to issue travel documents for [petitioner] or individuals like him[,]" and provided quantitative data showing that the country to which it sought to remove the petitioner had previously issued travel documents for similarly-situated people. *Id.* at 183-84.

The Government has provided no such evidence here. Instead, the evidence provided points in the opposite direction. In *Lu*, the embassy had not affirmatively refused travel documents; here, Uzbekistan denied Mr. Abramou's initial request for travel documents in December 2025 because "they were unable to locate a profile matching Petitioner's identity" based on Mr. Abramou's birth certificate from the Uzbek Soviet Socialist Republic. Quizhpi Decl. at ¶ 23. In *Lu*, the petitioner had been interviewed with the consulate; here, Mr. Abramou has not been

interviewed by the Uzbek consulate, and the Government represented at the Hearing that, despite its efforts, no movement had been made even on scheduling such an interview. Hearing Tr. at 16:12-15. In *Lu*, the government provided data showing people like the petitioner had been provided travel documents in the past; here, the Government has not provided any evidence to suggest that Uzbekistan has recently issued *any* travel documents to people who, like Mr. Abramou, were born in the Uzbek Soviet Socialist Republic. Further, when asked directly about this at the Hearing, the government averred that it was unaware of any such data indicating whether this has ever actually occurred. *Id.* at 17:23-18:8.

The Government's efforts to remove Mr. Abramou to Israel suffer from the same deficiencies, as well as others. A request to Israel for travel documents has been rejected because Mr. Abramou is not a citizen of Israel. So Decl. at ¶¶ 15-16. The Government represents that it is working to obtain Israeli citizenship for Mr. Abramou pursuant to Israel's Law of Return, but at the Hearing the Government also acknowledged that it needs Mr. Abramou's consent to proceed, Hearing Tr. at 18:22-19:21, and Mr. Abramou has indicated that he is not interested in Israeli citizenship at this time. *Id.* at 35:25-36:5. But even if he were interested, Mr. Abramou's ability to secure Israeli citizenship based on his Jewish parentage is still not guaranteed. Under Israel's Law of Return, citizenship can be denied based on a criminal record, which Petitioner has. S*ee How Is Eligibility for Aliyah Determined?*, The Jewish Agency for Israel, https://www.jewishagency.org/aliyah. And just as the Government has done with respect to Uzbekistan, the Government has not provided any data or other information that shows that people who are similarly situated to Mr. Abramou (i.e., those with a criminal record generally, or with one similar to his) have been granted Israeli citizenship. Thus, the Government has not shown that Mr. Abramou's removal to Israel is within the reasonably foreseeable future—indeed, his removal to Israel may not be even possible.

**CONCLUSION**

Accordingly, and for the reasons stated herein, the Government has not rebutted Mr. Abramou's showing that removal is unlikely in the reasonably foreseeable future. Under *Zadvydas*, and in accordance with the Court's prior order, immediate release, as opposed to a bond hearing, was the proper remedy.

Counsel for petitioner may file an application for attorney's fees and costs pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412 within the time provided by the Local Rules. The Clerk of Court is respectfully directed to enter judgment in Petitioner's favor pursuant to F.R.C.P. 58.

SO ORDERED.

Dated: June 16, 2026

New York, New York

DALE E. HO
United States District Judge